IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2015 Session

# STATE OF TENNESSEE v. HENG LAC LIU

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-D-3887    Monte Watkins, Judge**

**No. M2013-02838-CCA-R3-CD - Filed May 19, 2015**

A Davidson County jury convicted the Defendant, Hen Lac Liu, of four counts of sexual battery. On appeal, the Defendant contends: (1) that the trial court improperly admitted hearsay evidence; (2) that the trial court improperly excluded defense evidence of the victim's bias and lack of credibility; and (3) that the cumulative effect of these errors warrants a new trial. After a thorough review, we conclude that the cumulative effect of the errors by the trial court warrant a new trial for the Defendant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Patrick T. McNally, Nashville, Tennessee, for the appellant, Heng Lac Liu.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Glenn Funk, District Attorney General; Leticia Alexander and Deborah Housel, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
## I. Facts

This case arises from the victim's allegations that the Defendant, an acupuncturist, sexually assaulted her on July 4, 2008. Based on these allegations, a Davidson County grand jury indicted the Defendant for two counts of rape and two counts of sexual battery. At the Defendant's trial, the following evidence was presented: Alma Melendez testified that she was a native Spanish speaker, who hailed from Guatemala, but that she had learned some

English since moving to Nashville seven years ago. She said that she lived with her husband, two young children, and "a lady." Mrs. Melendez said that she was not working at the time of the trial but that, before 2008, she had worked as a housekeeper.

Mrs. Melendez testified that the Defendant had raped her on July 4, 2008, while she was at his clinic. Mrs. Melendez described the events leading up to the rape, saying that in 2008 she had been suffering from back pain for almost two years. She had seen four doctors, the last of whom told her that the pain was related to her sciatic nerve. She decided to seek the help of a chiropractor. Mrs. Melendez recalled that the treatment of the chiropractor took the pain from her back to her leg. While she was in treatment she had difficulty sitting, could not wear a belt or walk in heels, and could not push a grocery cart. Mrs. Melendez said that, while she was under the care of her doctors for her back pain, she became pregnant. She stopped the chiropractic treatment because she was afraid that it would affect her baby. After she gave birth, she had difficulty carrying her newborn baby and had to walk on her tip toe on her right foot. Members of her church recommended "Dr. Lee," who was an acpuncturist and had helped other members of the church.

Mrs. Melendez said that she inquired further about "Dr. Lee," but the church members told her that she could find him in the yellow pages. Mrs. Melendez said that she and her husband looked in the yellow pages and found "Dr. Liu," an acupuncturist who worked in close proximity to their house. Mrs. Melendez described her pain as "more than ten," on a scale of one to ten, when she went to see Dr. Liu, the Defendant, on July 4, 2008. She said that her appointment was close to noon that day and that her husband and son, who was six months old, accompanied her to the Defendant's office.

Mrs. Melendez said that there was a receptionist and a man seated to her left while she sat in the waiting room. Mrs. Melendez saw the Defendant walking toward her, and he called for she and her husband to follow him into his office. Once inside the Defendant's office, Mrs. Melendez's husband interpreted for her, translating what the Defendant was telling her. Mrs. Melendez and her husband told the doctor about Mrs. Melendez's symptoms. The Defendant showed her a diagram of the human body, asked her on which side she was hurting, and explained to her how acupuncture consisted of putting needles in her lower back area on the right side. Mrs. Melendez did not recall the Defendant telling her that she would be required to remove her clothing.

Mrs. Melendez testified that the Defendant then told her husband to stay in his office with the baby while he took Mrs. Melendez to an examination room. Mrs. Melendez saw in the room a chair and a stretcher type bed. Mrs. Melendez said that the Defendant handed her a towel, and swatted her on the behind. He told her to take her pants off. Mrs. Melendez said that she thought that maybe the Defendant's contact with her "behind" was an accident.

2

She took her pants off and placed the towel that he had given her around her waist.

Mrs. Melendez testified that, when the Defendant returned, he was not looking at her face but was looking in another direction. Mrs. Melendez asked the Defendant if she needed to remove her shirt also because it was long, and the Defendant said, "Yes, yes." Mrs. Melendez said that she removed her blouse and that she felt uncomfortable with a towel around her waist and only her bra and panties on. Mrs. Melendez said that the Defendant indicated that she should get on the stretcher bed face up, so she did. He then removed the towel covering the lower half of her body. Mrs. Melendez said that the Defendant then "took hold of [her] panties and took them off of [her.]" Mrs. Melendez said that she did not question him and repeated to herself "This is for my health."

Mrs. Melendez testified that the Defendant repeatedly opened and closed her legs and told her to "relax." She said she was scared to grab her clothes and leave because she thought her husband, who did not have immigration documents, might confront the Defendant. She was scared that they might be deported if police were notified.

Mrs. Melendez testified that the Defendant put his hand "on top of [her] vagina." She noticed that he was "sweating" and "laughing." She said he rubbed her vagina "a bunch of times" and "opened her legs up again." He then asked her to turn over and massaged the backside of her legs. He showed her a needle and then put the needle in her back. The Defendant then brought a lamp to heat the needles and laid a towel across her body. She said the Defendant turned on some "Chinese music."

Mrs. Melendez said that the Defendant left and returned with her husband. Mrs. Melendez was face down on the table, looking through a hole, when her husband entered. The Defendant told Mrs. Melendez's husband that he was going to take the needles out and then massage Mrs. Melendez to take away the pain. The Defendant and Mr. Melendez both exited the room. Mrs. Melendez laid on the bed for thirty minutes. She said that she wanted to scream but she was afraid that no one would believe her that the Defendant had acted inappropriately towards her.

After thirty minutes, the Defendant returned alone. He removed the needles, got a bottle of oil and began to massage her legs. The Defendant massaged her "butt cheeks," and then he stuck his finger into her anus. Mrs. Melendez said that she was "startled" and said "it's hard for me," which, at the time, she thought meant "it was hurting me." The Defendant told her to "relax," and did not remove his finger. The Defendant then "simply stopped" touching her anus and asked her to get on her knees on the ground with her "chest towards the ground." She said she could not get into the position the Defendant demonstrated for her, but she attempted to do so. He unhooked her bra and told her to turn around. Mrs. Melendez

3

said that she was naked at this point when the Defendant told her to turn around.

Mrs. Melendez said that the Defendant began to massage her legs again and "put his hand on [her] vagina." He opened and closed her legs and told her to relax. The Defendant, she said, began to rub her breasts while he was still "sweating" and "laughing." The Defendant observed that one of her breasts was bigger than the other and asked her why. She said that she did not know. The Defendant told her that he had concluded his examination of her and left the room.

Mrs. Melendez said that she put her clothes back on and left the room. She went to the Defendant's office, where her husband and baby were waiting. The Defendant told Mr. Melendez that Mrs. Melendez should return the following day. The Defendant also told Mr. Melendez to take Mrs. Melendez to the doctor because one of her breasts was larger than the other. The Defendant then sold medicine to Mrs. Melendez. Mr. Melendez went to the receptionist area to pay for the medication, while the Defendant and Mrs. Melendez remained in his office. Mrs. Melendez said that the Defendant asked Mrs. Melendez how to say "I love you" in Spanish. She said that she answered him. He told her that if you said "I love you" to a person in Chinese they would "hit you in the face." Mrs. Melendez said she was not comfortable with this conversation and thought, "Oh, this man is a criminal." Mrs. Melendez said that the Defendant asked her if she had sex with her husband and told her that he had heard "that Mexicans have sex three times a day." He then asked her if her husband was strong. She did not respond to him. Mrs. Melendez said the Defendant then asked her "How many inches is your husband?" She said that, at that point, she got up and went to the receptionist area and told her husband that she was going to pay and that she wanted to leave. She said she paid $120.00 for the treatment and medication. The Defendant, she said, reminded Mr. Melendez that Mrs. Melendez needed to return his office the following day.

Mrs. Melendez testified that, when she got into the car with her husband, she told him that she was never going to return and started crying. He asked her what was wrong, and she told him that the Defendant had abused her. He asked her why she did not run or scream, and she told him that she was in shock. She said that she did not contact the police because she was afraid she was going to be deported. She testified that she later called the church member who had recommended the doctor, and he told her that he had recommended "Daniel Lee" and not the Defendant.

Mrs. Melendez said that, after her treatment with the Defendant she felt better, could sit down more, and was in less pain. Due to this improvement, Mr. Melendez called Dr. Daniel Lee to schedule an appointment. Mrs. Melendez brought a friend with her, Olga Alduenda, and asked that Mrs. Alduenda remain with her.

4

Mrs. Melendez described her appointment with Dr. Lee. She said she filled out a form when she arrived with Mrs. Alduenda. Also present was Mrs. Alduenda's son and Mrs. Melendez's son. She was then called into a room, where Mrs. Alduenda described Mrs. Melendez's health problems to the doctor. Dr. Lee examined her with her clothes on and determined where she was in pain. He showed her a body map. He then put needles into her right leg. Mrs. Melendez said that she did not remove her clothing but simply lowered her pants a little bit at the waist.

Mrs. Melendez said she told Mrs. Alduenda that Dr. Lee's treatment was much different than the Defendant's treatment of her. She then told Mrs. Alduenda that the Defendant forced her to remove her clothing. Later, while they were in Dr. Lee's office, Mrs. Melendez told her the entire story of what had happened at the Defendant's office. She asked Mrs. Alduenda to tell Dr. Lee what had happened at the Defendant's office. Dr. Lee and Mrs. Alduenda encouraged her to contact the police.

Mrs. Melendez said that she contacted the police the following day, July 8, 2008. She spoke with a female officer and attempted to explain to her what had happened. She told the female officer and two other male officers, one of whom spoke Spanish, what had happened.

Mrs. Melendez said that she sought therapy after this incident. In therapy, she learned of a "U-visa," which is a visa given to people who have been the victims of a crime. She also filed a civil suit against the Defendant. Mrs. Melendez said that she never consented to the Defendant rubbing the top of her vagina, rubbing her breasts, or penetrating her anus with his finger.

During cross-examination, Mrs. Melendez testified that she understood that it was "very important" to be truthful during her interview with detectives. She agreed that she did not tell detectives about the other man seated in the Defendant's office when she arrived. Mrs. Melendez agreed that the Defendant attempted to explain to her what treatment she would be receiving before he treated her. He used charts of the body in his attempt to explain. She said that neither she nor her husband told the Defendant that she was in the country illegally.

Mrs. Melendez agreed that the Defendant's behavior was "unexpected" in multiple ways, including when he slapped her behind, told her to take her pants off, told her to take her blouse off, etc. She agreed that the Defendant placed needles into her back and that he invited her husband to come and see the needles in her back. She agreed that the Defendant left her alone with the needles in her back for thirty minutes while quiet music played. Mrs. Melendez said that she had testified that, during this time, she did not say anything because she was afraid that "they were not going to believe [her]." She then said that her husband

5

would have believed her but expressed concern that he might have engaged in a physical confrontation with the Defendant. She agreed that she went back to the Defendant's office with her husband and paid for the Defendant's services.

Mrs. Melendez agreed she told Detective Elliott that she reported the Defendant's conduct to the Health Department. She also told him that she was not pursuing that claim because the Health Department was going to make her pay for the cost of pursuing the claim. She disputed that this was untrue and said that she had been told that she would have to pay for the processing of the claim at the Health Department.

Mrs. Melendez attempted to explain inconsistencies between her trial testimony and her statement to detectives. The Defendant's attorney noted that the two accounts differed about the time when she told Mrs. Alduenda about the Defendant's conduct, the time that she made her appointment with Dr. Lee, and the time she learned Dr. Lee's name from the "brother" at her church. Mrs. Melendez agreed that she had previously made a statement that she had the name of Dr. Lee before she and her husband looked in the yellow pages. She had previously told someone that she was confused by the names Dr. Lee and Dr. Liu in the yellow pages.

Mrs. Melendez agreed that, at the time of trial, she and her husband had obtained U-visas. She agreed that the only reason she and her husband were allowed to stay in the country was because she was a victim in this case. She said that she also had a plaintiff's lawyer who was pursuing a lawsuit against the Defendant for twelve million dollars. Her attorney in that lawsuit had referred her to Dr. Jorge Boero. Mrs. Melendez agreed that her first lawsuit was filed by a Sean Lewis, but she said she never met with him. He non-suited the case, and then a second lawsuit was filed by Mario Ramos. Mrs. Melendez said that she did not know that her lawsuit alleged that she had suffered "medical expenses" and "lost wages" as a result of her alleged injuries. She agreed she did not have any medical expenses and that she was not working at the time of her contact with the Defendant.

During redirect examination, Mrs. Melendez testified that she had no legal training and that the lawsuit was filed in English. Mrs. Melendez said that she did not think to file a civil lawsuit until someone from her church, Alma Austin, mentioned that they had seen a change in her and encouraged her to do so.

During further cross examination, Mrs. Melendez testified that her attorney, Mario Ramos, was Mrs. Austin's brother-in-law. Mrs. Melendez said that she was unaware that Mr. Ramos advertised that his law practice included filing applications for U-visas. She denied, however, that he helped her with her U-visa. She said that, when she met with him, she told him that she was in the country illegally. She said that he told her about U-visas. She

6

explained, however, that she had already applied for her U-visa before she met with Mr. Ramos. Mrs. Melendez denied knowing that abusive sexual contact would qualify her for a U-visa. She said she was not aware that it was listed as the first thing on Mr. Ramos's website. She stated that she was aware, however, that her husband would qualify for a U-visa if she obtained one. Mrs. Melendez testified that she understood that her civil trial was on hold pending the outcome of the criminal trial. Mrs. Melendez testified that, after the conclusion of the criminal trial, she intended to seek permanent residency in the United States.

Kim Laymance, an officer with the Metropolitan Police Department, testified that she was working patrol on July 4, 2008. She and another officer, Larry Carter, responded to a rape call at Mrs. Melendez's home. She found Mrs. Melendez crying, upset, and looking ashamed to talk. Officer Carter, who spoke Spanish, attempted to discern what had taken place, but he was unable to do so. Officer Laymance said that they, therefore, called a friend of Mrs. Melendez, who interpreted for the officers.

Officer Laymance testified that, through the interpreter, she learned that Mrs. Melendez had been assaulted at a doctor's office. The officer described Mrs. Melendez as "ashamed," making it hard for the officer to "get a lot out of her." Officer Laymance recounted what Mrs. Melendez had told her, and it comported substantially with Mrs. Melendez's trial testimony. Officer Laymance testified that, based upon Mrs. Melendez's allegations, she contacted the sex crimes division of her department.

During cross-examination, Officer Laymance testified that her incident report indicated that Mrs. Melendez was not employed at the time she reported the incident. Officer Laymance agreed that the incident report she took from Mrs. Melendez indicated that the Defendant "slapped . . . [her] on the butt," before telling her to get on the table. While she was on the table, the Defendant told her to "roll over" and then massaged her "on her breasts." The report indicated that Mrs. Melendez stated that the Defendant started touching her "in the vagina area" and that Mrs. Melendez then told the Defendant that "she had to go and got dressed and left." Officer Laymance said that she did not make an arrest in this case and had no further involvement after taking Mrs. Melendez's report.

During redirect examination, Officer Laymance testified that she obtained the information from Mrs. Melendez through an interpreter. She said that she never went over the report with Mrs. Melendez, and Mrs. Melendez never signed the document.

Olga Alduenda testified that she had lived in Nashville for seventeen years and that she met Mrs. Melendez in 2006 through the church that they both attended. In 2008, Mrs. Alduenda, who was very pregnant, noticed that Mrs. Melendez, who was newly pregnant,

7

was limping. Mrs. Melendez explained that she suffered pain from her hip all the way to her heel. Mrs. Melendez told Mrs. Alduenda that she had been multiple places to determine what was wrong with her and that she was spending "a lot" of money attempting to fix the issue with no resolution. Mrs. Alduenda told Mrs. Melendez about acupuncturist Daniel Lee, whom Mrs. Alduenda was seeing for treatment. Mrs. Alduenda did not give Mrs. Melendez Dr. Lee's information that day because her cell phone was broken.

Mrs. Alduenda said that, a few days later, Mrs. Melendez called her and asked for Dr. Lee's information, which Mrs. Alduenda provided to her. In the same conversation, Mrs. Melendez asked Mrs. Alduenda to accompany her to the appointment. Mrs. Melendez told Mrs. Alduenda that she had been to another acupuncturist but "didn't like it."

Mrs. Alduenda met Mrs. Melendez at Dr. Lee's office. Mrs. Alduenda noticed that Mrs. Melendez seemed sad so she asked Mrs. Melendez how she was feeling. Mrs. Melendez responded that her pain went "all the way to the floor again" and that it was too hard for her to "carry [her] baby with the car seat." Mrs. Alduenda and Mrs. Melendez went into the office together and registered her. When they were brought to the treatment room, Mrs. Alduenda reassured Mrs. Melendez that everything would be fine and that Dr. Lee had been treating Mrs. Alduenda for fifteen years.

Dr. Lee, she said, asked Mrs. Melendez about her symptoms. He briefly examined Mrs. Melendez and then asked her to lift up her pant leg. He placed some needles close to her feet. He then asked her to pull down the waist line of her pants and put some needles there also. After placing these needles in her back, he told them that he was going to leave and then return. Mrs. Alduenda said that, when the doctor left the room, Mrs. Melendez started crying. Mrs. Alduenda asked her what was wrong, and she told her that "Something went really wrong with the other doctor." Mrs. Melendez told her that the other doctor asked her to undress and that she complied. Mrs. Alduenda said Mrs. Melendez told her that the other doctor never put needles in her but that he only massaged her. Mrs. Alduenda said that Mrs. Melendez kept crying and told her that the other doctor had touched her breasts and massaged her "vagina area." Mrs. Alduenda asked Mrs. Melendez how she responded, and Mrs. Melendez said "I said nothing. I was just, you know, crying. I didn't know what to do."

Mrs. Alduenda testified that Dr. Lee returned and asked Mrs. Melendez why she was crying. Mrs. Alduenda told Dr. Lee about Mrs. Melendez's other experience with the Defendant. Dr. Lee said that Mrs. Melendez was not properly treated and that Mrs. Melendez should make a police report. Mrs. Alduenda encouraged Mrs. Melendez to report it, but Mrs. Melendez said that she should forgive the other doctor. Mrs. Alduenda asked Mrs. Melendez if she would want another women to have to experience the same thing.

8

When Mrs. Melendez said, "No, of course not," Mrs. Alduenda told her that she should report it then.

Mrs. Alduenda said that Dr. Lee asked Mrs. Melendez more questions, and Mrs. Melendez told him that the Defendant had placed needles in her back after he massaged her. Dr. Lee also encouraged Mrs. Melendez not to drink the medicinal seeds that the Defendant had provided to her, explaining that she could not be sure what they were. Mrs. Melendez expressed her inability to contact police, saying that she did not have papers and did not speak any English. Mrs. Alduenda told her that she should still contact police, and Mrs. Alduenda offered to help her. Mrs. Alduenda testified that Mrs. Melendez maintained that she did not want to report the offense and just wanted to forget everything.

At some point later, Mrs. Melendez called Mrs. Alduenda and informed her that the police were at her home, and she asked Mrs. Alduenda to translate for her. Mrs. Alduenda testified that she translated for Mrs. Melendez. She also later translated when Mrs. Melendez spoke with Detective Elliot. She learned, at that point, that the Defendant, had "put his finger in [Mrs. Melendez's] anus." Mrs. Melendez did not want Mrs. Alduenda to tell this fact to the detective, but Mrs. Alduenda convinced Mrs. Melendez to allow her to do so. She said that Mrs. Melendez had a difficult time telling the detective about the Defendant touching her vagina and putting his finger in her anus.

During cross-examination, Mrs. Alduenda testified that she first became friends with Mrs. Melendez in 2006 through their joint affiliation with their church. She said that she was still friends with Mrs. Melendez at the time of trial but that they did not see each other frequently because their church had divided. Mrs. Melendez testified that she translated for the female officer in July 2008. She translated for the male detective in October 2008. She agreed that Mrs. Melendez told the male detective more details and allegations than she did to the female officer. Mrs. Alduenda agreed that the first time that she translated for Mrs. Melendez when Mrs. Melendez spoke with officers, Mrs. Melendez told the officers that she told the doctor she had to go and got dressed and left.

Gilbert Ramirez, an officer with the Metropolitan Nashville Police Department, testified that he worked with the "El Protector Program," a program designed to encourage police officers to interact with the Hispanic community. He explained that many people in the Hispanic community were scared to report a crime because they thought they would be deported automatically even if they were the victim of a crime. Officer Ramirez's job was to show the community that the police were there to serve them also. He did this through education.

Officer Ramirez testified that he translated for Detective Elliott when he interviewed

Ms. Melendez on July 16, 2008. During the translation, Officer Ramirez learned that Mrs. Melendez was having pain in her upper thigh area. She spoke with someone at church who recommended acupuncture. Mrs. Melendez said that she went to an examination room with the Defendant. He told her that she needed to remove her pants. She did, and she put a towel over her lower body. The Defendant then began massaging her legs. He massaged the upper area of her legs. She said he then removed her panties and, at the same time, the towels "came off." Mrs. Melendez said the Defendant massaged her vagina. Officer Ramirez recounted the remainder of Mrs. Melendez's interview with Detective Elliot, and it substantially complied with her trial testimony. He described Mrs. Melendez as seeming "embarrassed" and "uncomfortable" during the interview. Officer Ramirez testified that Mrs. Melendez's immigration status was not mentioned during the interview.

During cross-examination, Officer Ramirez testified that he did not know during the interview that Mrs. Melendez was in the country illegally. The officer agreed that Mrs. Melendez did not only tell the officer that the Defendant had rubbed her vagina but she also demonstrated it by rubbing her own body in that area. She also got onto the floor to show the position that the Defendant had her get into. Officer Ramirez agreed that Mrs. Melendez brought with her to the interview the medicinal seeds that she had purchased from the Defendant, and she gave those to the officers. He agreed that she was open and cooperative during the duration of the interview.

Officer Ramirez testified that Mrs. Melendez said that she had contacted the Health Department about the Defendant. She said that she did not pursue this course of action because they were going to charge her money. Detective Elliott responded that he did not think that this statement was accurate and told her not to worry.

Daniel Lee, an acupuncturist, testified that he had graduated from an accredited acupuncture school, and he had been practicing for twenty years. He said that acupuncture was basically the giving of energy to our bodies from different sources. He said acupuncture could be used to relieve pain, help allergies, and for other reasons. Dr. Lee was licensed in the state of Tennessee.

Dr. Lee testified that, in July 2008, he treated Mrs. Melendez, who was accompanied by one of his patients, for leg pain. Mrs. Melendez volunteered what had happened to her when she went to see a previous acupuncturist. Dr. Lee got the impression that Mrs. Melendez did not trust him or trust acupuncture therapy. Dr. Lee described how he treated Mrs. Melendez, saying that he first checked the area around which she was complaining of pain. He believed she had a bulging disk. He, therefore, sterilized her skin in that area and gave her acupuncture therapy. He said that, in his expert opinion, Mrs. Melendez did not need to remove her clothing to be treated. He said that, even if she complained of sciatic

10

nerve pain, she would not have had to remove her clothing. Dr. Lee said that he had never had the experience of needing someone to remove their clothing in order for him to treat them. He further clarified that it was unnecessary to massage a woman's vagina or breasts or penetrate their anus for treatment purposes. Dr. Lee said that he encouraged the victim to contact police about her previous experience.

During cross-examination, Dr. Lee identified "charts of the body" from pictures of the Defendant's office. He said that they showed the physical anatomy of the body and also the acupuncture channels. These charts were sometimes used to show a patient where the needles would be inserted. He looked at the pictures of the Defendant's treatment rooms, and he said that his own treatment rooms were similar. Dr. Lee testified that Mrs. Melendez told him that the Defendant had touched her genital area and her breasts. She did not mention to Dr. Lee that the Defendant had penetrated her anus with his finger.

David Elliot, a detective with the Metropolitan Nashville Police Department, testified that he investigated sexual assault. He said that victims were often reluctant to come forward and would sometimes disclose allegations slowly over time. He also explained that there was not always physical evidence confirming a victim's allegations.

In July 2008, Detective Elliot said he received Officer Laymance's incident report stating Mrs. Melendez's allegations. He contacted Mrs. Melendez through an interpreter on July 14, 2008, and arranged to interview her on July 16, 2008. Detective Elliot stated that he recorded her interview. Detective Elliot said that he could not communicate with Mrs. Melendez directly and used the aid of an interpreter. He said that she did, however, use hand gestures to display some of her allegations against the Defendant. Detective Elliot described Mrs. Melendez as someone with "a broken spirit." He said that she had her head down and cried a few times during the interview. The detective said that Mrs. Melendez gave him the "seeds" that she had purchased from the Defendant.

During cross-examination, Detective Elliot testified that the night before trial he tendered to the defense a CD that had recordings of his interviews with Dr. Lee, Mrs. Alduenda, and Mrs. Melendez's husband, Hipolito Jimenez. During his interview with Mr. Jimenez, the detective's equipment recorded only his questions and not Mr. Jimenez's responses.

Detective Elliot said that he went to the Defendant's clinic on August 1, 2008. He did not have a Chinese interpreter with him, but the Defendant was present. The Defendant showed him treatment notes for Mrs. Melendez, but they were written in a foreign language that the detective could not read. The Defendant also showed him the "body charts." The detective estimated that he was at the Defendant's office for approximately thirty to forty-

11

five minutes, and he described the Defendant as "[v]ery polite."

Detective Elliot testified that, in the days following his visit to the Defendant's office, he interviewed Mr. Jimenez and Mrs. Alduenda. He then presented the case to the grand jury in November. After the grand jury returned the indictment, officers arrested the Defendant on November 26, 2008.

The detective identified multiple photographs of the Defendant's office, all presented by the defense. He agreed that, during the course of his investigation, he did not interview the receptionist or the other man identified by Mrs. Melendez as being present. He also did not obtain the Defendant's patient record for his treatment of Mrs. Melendez. The detective testified he was not aware at the time he went before the grand jury that Mrs. Melendez was seeking twelve million dollars in compensation from the Defendant. He similarly did not know that she was in the country illegally and was seeking and obtained a U-visa.

Detective Elliot testified that Mrs. Melendez did not tell him about speaking with Mrs. Austin from her church, so he did not interview Mrs. Austin. The detective agreed that he never looked in the yellow pages to ensure that the Defendant or Dr. Lee were listed there.

Hipolito Jimenez, Mrs. Melendez's husband, testified that he had lived in Nashville since 2002 and had been married to Mrs. Melendez for seven years. He married her after meeting her in 2006. He said that in the two years proceeding 2008 she was suffering from pain in her right leg. He had taken her to several places seeking help for the pain, including medical doctors. One doctor had prescribed medication, however, Mrs. Melendez stopped taking the prescribed medication when her pain did not improve. Mr. Jimenez testified that his wife also sought treatment from a chiropractor. When neither of those had worked, Mrs. Melendez's friend suggested acupuncture. She gave Mrs. Melendez a name. Mr. Jimenez looked in the yellow pages and found "Dr. Liu" listed. He thought this was the doctor that Mrs. Melendez's friend had recommended.

Mr. Jimenez testified that he called the Defendant and made an appointment for the same day. Mr. Jimenez drove Mrs. Melendez and their son to the appointment. Mr. Jimenez said that there was an Asian receptionist waiting when they arrived. The receptionist did not have them fill out any paperwork. They went to the Defendant's office where Mr. Jimenez told the Defendant about Mrs. Melendez's pain. The Defendant told him that he believed that Mrs. Melendez was suffering from sciatic nerve pain. He told him that he would place needles on her "butt" to make her feel comfortable. The Defendant then took Mrs. Melendez to an examination room while Mr. Jimenez sat in the waiting room. Mr. Jimenez testified that the Defendant never took Mrs. Melendez's blood pressure, weight, or pulse. He never asked her about allergies or any other medical issues. The Defendant sold Mrs. Melendez

some seeds for medicinal use but did not give her any information about what to do with the seeds.

Mr. Jimenez testified that, after waiting for some period of time in the waiting room, the Defendant brought him into the examination room. He showed Mr. Jimenez the needles in Mrs. Melendez's "right butt." He then told her that he was going to pull out the needles and give her a massage to relieve the pain of the needles. Mr. Jimenez said that, at this point, Mrs. Melendez, who was "almost naked" and wearing only a towel, was face-down on the bed. Mr. Jimenez said that the Defendant then told him to leave. About thirty minutes later, the Defendant and Mrs. Melendez exited the treatment room. He joined them in his office. The Defendant told Mr. Jimenez that one of Mrs. Melendez's breasts was larger than the other. Mr. Jimenez explained to the Defendant that he believed that this was because Mrs. Melendez was breast feeding their son. The Defendant told him that he should see a doctor because it could be cancer. Mr. Jimenez said he stepped out of the office to help the receptionist translate a telephone call. Mr. Jimenez said that he went back to the Defendant's office, and the Defendant told him that he needed to see Mrs. Melendez the following day. They then paid in cash and left.

Mr. Jimenez said that after they left Mrs. Melendez started crying. She told him that the Defendant had touched her private parts. Mr. Jimenez asked her why she did not run. Mrs. Melendez became angry with him and started crying more and asked him to take her home. Mr. Jimenez said that he wanted to return to the office and speak with the Defendant because he was angry but Mrs. Melendez told him not to do so. In response to Mr. Jimenez asking Mrs. Melendez why she did not tell him or call for him, she said that she was afraid that they would get into trouble because they were in the country illegally. On the way home, Mr. Jimenez was angry with Mrs. Melendez for not saying anything to him during the procedure. The two argued, and Mrs. Melendez told him that she wanted a divorce.

Mr. Jimenez said that, when they got home, he felt badly because she kept crying. She called her friends and told them about the appointment with the Defendant. Over the days that followed, Mrs. Melendez told Mr. Jimenez more details about the Defendant's inappropriate physical contact with her. She also told him that she felt some relief from her pain. She got the name and number of the other acupuncturist, Dr. Lee. Mrs. Melendez called Dr. Lee the following day and set up an appointment for the next Monday. Mrs. Melendez went to the appointment with her friend, and she told Mr. Jimenez that her friend would stay with her for the duration of her appointment.

Mr. Jimenez testified that he was out of town for work when Mrs. Melendez called the police. He said that he spoke with a detective later, and at that time he learned that the Defendant had also digitally penetrated Mrs. Melendez's anus. He said that he then felt

guilty for being angry with Mrs. Melendez for not telling him during her appointment.

Mr. Jimenez testified that he did not learn about a U-visa until after Mrs. Melendez had reported this incident to the police. He said that someone at the police department had informed Mrs. Melendez about the U-visa.

During cross-examination, Mr. Jimenez testified that he learned about the digital penetration from the psychologist report. He agreed that this was several years after his wife's original accusations. Mr. Jimenez testified that the psychologist was the doctor to whom Mrs. Melendez's civil attorney had referred her. He then said he was unsure when he learned about Mrs. Melendez's allegation of digital penetration but that it was after he spoke with Detective Elliot.

Mr. Jimenez acknowledged that he previously testified that he did not see the Defendant take any notes. He then identified some notes from the Defendant's office which bore Mr. Jimenez's name and signature. He said he did not remember signing his name.

At this point in the trial, the State elected facts to support each count alleged in the indictment. For Count 1, rape, the State elected the allegation that the Defendant digitally penetrated Mrs. Melendez's anus while she was on the examination table. For Count 2, rape by fraud, the State elected the allegation that the Defendant digitally penetrated Mrs. Melendez's anus while she was on the examination table. For Count 3, sexual battery, the State elected the allegation that the Defendant placed his palm on the victim's vagina and rubbed his hand on her vagina in a circular motion while she was on the examination table. For Count 4, sexual battery by fraud, the State elected the allegation that the Defendant placed his palm on the victim's vagina and rubbed his hand on her vagina in a circular motion.

Glenn Balletto, the Chief Deputy Clerk for the Circuit Court of Davidson County, testified[1] that Mrs. Melendez filed a civil lawsuit against the Defendant. A certified copy of her complaint was entered into the record.

The Defendant testified through a translator that he was fifty-nine years old and lived in Nashville, Tennessee, with his wife. He said that he had been practicing acupuncture for thirty years and owned an acupuncture clinic. He was born in Shanghai, China and went to college, graduate school, and medical school in China. He completed five years of medical

---

[1]Three pages of the transcript, page 468-470 are missing from the record. Mr. Balletto testified first in a jury out hearing, to ensure that he only discussed one of the lawsuits filed by Mrs. Melendez, so, despite the omission, we can accurately restate his trial testimony.

14

school, graduated, and started practicing medicine in China, where he met his wife and the two were married. At one time, he worked as a surgeon in China specializing in gastro-intestinal surgery. The Defendant explained that he left "Western Medicine" for "Traditional Chinese [Medicine]" because his eyesight began failing. He said that he had authored books and articles about acupuncture and traditional Chinese medicine.

The Defendant said that, in 1999, he decided to move to the United States of America. He came to this decision based upon the freedoms in the United States and also the flourishing of scientific research. The Defendant came to America on a study visa. When he left China, his wife, who was a Traditional Chinese Medical School professor, initially stayed behind, but later joined him in America.

The Defendant testified that, after coming to America, he passed the acupuncture exam. He identified several certifications he had received since residing in America. The Defendant began practicing in New York in 2003. After visiting a friend in Tennessee and liking the area, he closed his New York practice and opened one in Tennessee. The Defendant said that he had never had his license suspended or revoked. The Defendant identified pictures of his office as it looked at the time that Mrs. Melendez came to see him.

The Defendant described both acupuncture and acupressure. He described the needles used in acupuncture and said that acupressure was "the stimulation through the finger at the pressure points to create the sensation of soreness, numbness, swelling."

The Defendant said that he did not have a receptionist in July 2008. He said that he answered the phone and scheduled his own appointments. He said that he worked in his office alone and attempted to communicate with his patients using his limited English. He said that in the event he could not communicate with them properly he would refer them to another clinic. The Defendant said he kept notes on all the patients that he treated.

The Defendant identified his notes from his treatment of Mrs. Melendez. He said that his notes indicated that she and her husband came to his office. She was twenty-eight years old at the time and from Guatemala. Looking at his daily log, upon which he recorded the treatment he performed on each patient, the Defendant testified that he noted that Mrs. Melendez complained of a sciatic nerve problem, pain in her stomach, and pain in her leg. His notes also indicated that Mrs. Melendez paid $120.00 for treatment and that she scheduled a follow-up appointment for the following day.

The Defendant testified that, based upon his notes, he recalled treating Mrs. Melendez. He said that she did not speak any English, but her husband did and interpreted for her. The Defendant said that he spoke with the couple about Mrs. Melendez's complaints of pain. He

15

used a rubber model of a body and charts in his office to ensure he understood her pain. The Defendant said that he informed the couple that he would use acupuncture to treat Mrs. Melendez's sciatic nerve pain and that he would use acupressure to treat her stomach pain. He said he told them also that he would give Mrs. Melendez Chinese herbal medicine, in the form of pills, to help treat her pain. The Defendant testified he informed the couple of the cost for his treatment, which was $120.00.

The Defendant testified that he brought Mr. Jimenez and Mrs. Melendez to the treatment room. He informed them that Mrs. Melendez needed to remove the garments on her lower body in order to expose the area that he needed to treat for the sciatic nerve pain. He said that he explained, "in detail," using the model, showing her "the exact portion that I need[ed] to have exposed on the bed, naked, so [he] could use the needles." The Defendant said he provided a towel to cover his patients' private areas. The Defendant said, "According to my experience of clinical treatment you first treat for acupuncture and next, afterwards, you treat with acupressure." He said that, according to traditional medicine, one should leave the needles in place for thirty minutes.

The Defendant said that he informed Mr. Jimenez and Mrs. Melendez that there was a waiting bench outside the room where Mr. Jimenez sat. He said that he went to his office and waited. He then returned, knocked on the door, and asked if Mrs. Melendez was ready. She responded she was, and he entered the room where he found her laying face down on the bed. Mrs. Melendez had exposed the part that the Defendant needed exposed for acupuncture treatment. He said he got a swab with alcohol, rubbed it on the place where he intended to apply needles, and applied the needles. He said, "It's required that acupuncture be applied in the best manner. You do it at once." He then turned on the treatment lamp and left the room.

The Defendant said he returned shortly thereafter with Mr. Jimenez. The Defendant said that he told Mr. Jimenez that Mrs. Melendez needed to remain there for thirty minutes and that Mr. Jimenez could remain in the room. Mr. Jimenez said that their child would cry, and said that he wanted to wait on the waiting bench. The Defendant said that, during the duration of the treatment, the door to the treatment room remained open because it was July and "very, very hot."

The Defendant testified that, after thirty minutes, he told Mr. Jimenez that he would return to the examination room to remove the needles and complete the acupressure. Mr. Jimenez told him that he was going to continue sitting in the waiting room with the couple's baby. The Defendant said that he entered the examination room and removed the needles. He then applied an oil and started the acupressure treatment. He said that, starting from Mrs. Melendez's waist and going to her buttocks and upper leg, he attempted to find pressure

16

points.

The Defendant said that, after ten minutes or more of doing this, he needed to address Mrs. Melendez's stomach pain. He asked her to turn over and face up. He then applied to pressure points on her front. He said that this did not take "more than a few minutes," and it concluded his treatment. He then told her she could dress and return to his office where Mr. Jimenez was also waiting. There, the Defendant gave Mrs. Melendez the herbal medicine he suggested as part of her treatment. The Defendant explained to the couple how to use the medicine. He said that he then asked how Mrs. Melendez felt. She said that she felt "very good." The Defendant described the couple as "very polite." He said that he explained to them that this type of problem usually took ten treatments to correct. Mr. Jimenez said that they could likely not afford ten treatments. The Defendant said he explained that he could not lower his price. The couple then made an appointment for the following day.

The Defendant testified that, at no time, did he "slap" Mrs. Melendez or place his hands on her breasts. He said that he was a licensed doctor and would not risk his license in that manner. Further, he had a green card and would not risk deportation. The Defendant said that he had a happy family, with his wife and daughter, and would not want to break up their family that way.

The Defendant recounted the police coming to his office. He said he reviewed his notes to recall treating Mrs. Melendez. He said he had difficulty understanding them but that they used his body charts to relay Mrs. Melendez's allegations against him. The Defendant said that he understood and informed the officer that he did not do the things that she alleged he did. The Defendant said the officers verified that the door to his treatment room had no lock. The Defendant denied that he ever inquired about the length of Mrs. Melendez's husband's penis. In support of his denial that he did not ask about Mr. Jimenez's penis size, he offered that he spoke Chinese, and she spoke Spanish, and he would have had no way to communicate this question with her.

The Defendant said that he was arrested shortly thereafter. He said he had never been arrested before. He hired a lawyer to represent him and continued to practice acupuncture and acupressure for the five years he waited for his trial. He said that the Health Board never came to investigate his practice. The Defendant also had to hire a lawyer to defend him against Mrs. Melendez's twelve-million dollar civil lawsuit.

During cross-examination, the Defendant said that he would have been the person to make the appointment, but he did not specifically recall making Mrs. Melendez's appointment. He said that he did not understand much English but that he was able to

17

communicate with Mr. Jimenez and Mrs. Melendez enough to understand where they were from. He also felt comfortable that he could communicate with them sufficiently to treat Mrs. Melendez.

The Defendant said he explained to Mr. Jimenez in his office that Mrs. Melendez would need to remove her outer clothing to be treated. He said that Mrs. Melendez kept on her panties and bra. The Defendant testified that he may have indicated on direct examination that Mrs. Melendez removed her panties, but she in fact did not. The Defendant said that he left the door to the treatment room partially opened, despite the fact that the corridor was a shared corridor and Mrs. Melendez was in her bra and panties only.

The Defendant agreed that he was investigated by police about a separate incident in 2007.

The Defendant testified that he did not remove the towel that was on Mrs. Melendez when he massaged her with oil. He said that he did place some oil on her stomach when he massaged that area. The Defendant said he did not recall Detective Elliot testifying that there was a female Asian receptionist when he came to interview the Defendant. He said that he did have difficulty communicating with the detective.

Linda Smith, an English Language Learners ("ELL") teacher for more than thirty-four years who resided in Brentwood, Tennessee, testified that she knew Dr. Liu professionally as an acupuncturist. She said she had been his patient for between five and six years and was very familiar with both of his clinics. Mrs. Smith testified that Dr. Liu treated her for sciatica. At the beginning of each appointment, he would take her blood pressure and check her tongue for signs of her fluid levels. She said that she removed her clothing to be treated but covered her "rear end" with a towel. Mrs. Smith said that she worked with the Defendant and the Defendant's wife in an attempt to help them learn the English language better. Mrs. Smith said that Dr. Liu did not have a receptionist and that she scheduled her appointments through Dr. Liu. Mrs. Smith said that four of her family members see the Defendant for treatment, in addition to one of her close friends. She said that she had referred them to him. Mrs. Smith said that her daughter-in-law, who was a softball pitching coach at a local college, saw the Defendant for treatment, and she had referred several of her students. Mrs. Smith said that the Defendant had a reputation of being professional; "know[ing] what he's doing;" being trustworthy; giving a fair price for his services; and being effective.

During cross-examination, Mrs. Smith testified that the Defendant had never made her remove her bra or panties for treatment. Mrs. Smith said that the door was always cracked about an inch during her treatment. Mrs. Smith said that, when the Defendant was treating her sciatica, he placed needles above her panty line and, sometimes, below her panty

18

line. He never removed her panties entirely. Mrs. Smith testified that she never went to appointments on consecutive days.

Xiaoduan Fan testified that she and her husband lived and resided in Nashville, Tennessee with their ten-year-old daughter. She said that her grandmother was a traditional Chinese doctor who worked with both acupuncture and acupressure to heal problems. Mrs. Fan said that she was from China and had been in the United States since 1997. She explained that she was here legally pursuant to her green card. In 2006, Fan, who worked at a computer all day and had resulting physical problems, sought the treatment of a traditional Chinese doctor. She said that she knew that there were some "Chinese small business office[s]" on Nolensville Road. In this area, she found the Defendant's clinic. When she entered his office, she spoke with both the Defendant and his wife. She asked them "a lot of questions" about traditional Chinese medicine, and they "answer[ed] [them] correctly." Mrs. Fan, therefore, started treatment with them.

Mrs. Fan testified that she never saw a receptionist at the Defendant's office, and, when she called, she scheduled the appointments directly with him. She said she had seen the Defendant's wife, daughter, and sometimes his friends at the office, but no one who was employed there besides the Defendant. Mrs. Fan said that the Defendant did not have a credit card machine, so she was required to pay by cash or check. Mrs. Fan confirmed that she removed her clothing when the Defendant treated her, which she said was the only way for him to get the needles into her back. She said that she never had to remove her panties, but did sometimes remove her bra, and that the Defendant left the room while she undressed and provided her a towel with which to cover herself. Mrs. Fan said that if she had a different problem, such as pain in her legs, traditional Chinese medicine would dictate that she remove her panties for acupuncture. She also confirmed that he followed the acupuncture with a massage, which was the acupressure portion of the treatment.

Mrs. Fan testified that all of her friends, who were Chinese, recommended the Defendant. She said that she did refer some people to the Defendant but that she did not need to because "he [was] popular in our community." Mrs. Fan said that the Defendant treated at least five of her co-workers. After he treated each of them, they gave her "very positive feedback." Mrs. Fan said that the Defendant was "very good" at what he did, that he was honest, had integrity, was trust-worthy, and also had a good sense of humor.

During cross-examination, Mrs. Fan said that, each time she saw the Defendant, he took her blood pressure, pulse, and checked her tongue, which was the traditional Chinese way to see what was in the body. Mrs. Fan said that she originally saw the Defendant once per week but had gone down to once per month. She paid him $60 for each visit. Mrs. Fan said that, each time that the Defendant treated her, he would not completely shut the door and

would leave it open about an inch. Mrs. Fan said that the Defendant never rubbed or massaged her stomach, but she explained that she did not complain of stomach pain.

Morton Wu testified that he was born in China and now resided in Nashville, Tennessee. He said that he had suffered a neck injury from a car accident in 2007, and began treatment with the Defendant. He also had bone surgery in 2010, and the Defendant helped him to reduce his pain from surgery. Mr. Wu testified that he had a PhD and was an epidemiologist, who studied rare communicable diseases, for the Tennessee Department of Health. Mr. Wu said that the Defendant had been treating him for several years and that the two had also developed a friendship. Their respective daughters were also classmates at the University of Texas and good friends.

Mr. Wu testified that the Chinese community in Nashville was comprised of more than ten thousand people. He had heard many people talk about the Defendant's reputation as a man of "great honors" who could be trusted. He described the Defendant as having a reputation of being committed to his patients, being kind and compassionate, and helping people even when they could not pay his fee in full.

During cross-examination, Mr. Wu testified that the Defendant had never inserted his finger into Mr. Wu's anus and that it would be improper of him to do so when treating Mr. Wu. Mr. Wu said he had met the Defendant's wife, but he believed that she resided in New York City for some period of time and that she and the Defendant were sometimes in New York City and sometimes in China.

Fen Wang testified through an interpreter that he was born in China but currently lived in Nashville, Tennessee, and he worked for Vanderbilt University doing medical research. Mr. Wang testified that he had known the Defendant for more than eight years and that the two had met when Mr. Wang sought treatment for pain he was having around his waist area. He said that, the first time he went to see the Defendant, the two conversed about topics pertaining to the medical field, as the two were both in that field. As they became more acquainted, they became friends. Mr. Wang testified that he had to remove his outer clothing for treatment, and the Defendant provided him a towel with which to cover himself. Mr. Wang said he had never seen a receptionist at the Defendant's office.

Mr. Wang testified that the Chinese community had "Chinese festivities" where the community would gather and meet. He said that "every single occasion" that the Defendant was mentioned people said that he was "an excellent person, excellent doctor." He said that people in their community invited the Defendant to give talks about how to take care of and maintain their health.

Kerry Tang testified that she was born in China and came to the United States to study. She received both her Bachelors in Accounting and her MBA in the United States. Mrs. Tang first became acquainted with the Defendant when he was looking for office space. Mrs. Tang owned a tax service, and the building in which it was operated, and she wanted to sublease a portion of that building. She said that the Defendant subleased the space and began operating his acupuncture service in her building. The two shared a main entrance.

Mrs. Tang said that she never saw a receptionist at the Defendant's office, and she passed by his office every day on her way to her own office. Mrs. Tang said that her community trusted the Defendant because he was of the traditional medical school, was a professor, and had multiple licenses. Mrs. Tang testified that her community thought him to be a "very honorable person."

Gary Certain testified that he was born and raised in Long Island, New York. He said that he went to a small Catholic undergraduate school in New York State and attended law school at Georgetown University Law Center. After law school, he began working for the Bronx County District Attorney's Office in New York. At the time of trial, he owned part of a law firm that focused on civil litigation.

Mr. Certain said that he met the Defendant about ten years before the trial after suffering a torn patella tendon. As a result of his injury he had to have his knee reconstructed. At the same time, he fractured the third metacarpal in his hand, so he could not use crutches to walk. He said that, after his surgery, he had a lot of pain, swelling, and circulation problems. His wife suggested acupuncture, and, after researching it, he decided to go to the Defendant's office, which was across the street from where he was living in New York.

Mr. Certain recalled that the Defendant treated him for more than a year, and he said that the Defendant did not have a receptionist at the time. Mr. Certain recalled that the Defendant put his "all" into treating him. The two became friends, and their families became friends. The Defendant also treated Mr. Certain's wife, sister, and mother, all upon Mr. Certain's recommendation.

Mr. Certain testified that he had heard people in their neighborhood talking about the Defendant. He said the Defendant was well known because he was "very friendly, very outgoing, very helpful, [and] very generous." Mr. Certain said that, in their mostly Irish and Italian neighborhood, the Defendant had a reputation for honesty.

Based upon this evidence, the jury convicted the Defendant of two counts of sexual

battery, one count of sexual battery without consent, and one count of sexual battery by fraud. The trial court merged two of the convictions and sentenced the Defendant to a term of split-confinement, ordering the Defendant serve a two-year sentence, forty days of which he would be incarcerated. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends: (1) that the trial court improperly admitted hearsay evidence; (2) that the trial court improperly excluded defense evidence of the victim's bias and lack of credibility; and (3) that the cumulative effect of these errors warrants a new trial.

## A. Hearsay Evidence

The Defendant contends that the trial court erred when it admitted "prejudicial hearsay," noting three examples, discussed below. The State counters that the trial court properly admitted the evidence.

Hearsay evidence consists of out-of-court statements offered for the truth of the matter they assert. Tenn. R. Evid. 801(c). There are concerns with reliability and the inability to cross-examine such statements, which is why they are excluded as admissible evidence. Tenn. R. Evid. 802.

Our Supreme Court has recently articulated the standard of review applicable for an appellate court's review of a trial court's hearsay ruling. *See Edward Thomas Kendrick, III v. State*, 454 S.W.3d 450, 479 (Tenn. Jan. 16, 2015). The Court stated:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. *State v. Gilley*, 297 S.W.3d at 759-61. Once the trial court has made its factual findings, the next questions–whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule–are questions of law subject to de novo review. *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn.

Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

> If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement. However, the statement may otherwise run afoul of another rule of evidence. *State v. Gilley*, 297 S.W.3d at 760-61. For example, a trial court may decline to admit an excited utterance if it finds the utterance lacks relevance under Tenn. R. Evid. 401 & 402 or if it finds the utterance's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. If a trial court excludes otherwise admissible hearsay on the basis of Rule 401, 402, or 403, this determination is reviewed for abuse of discretion. *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992); *State v. Gilley*, 297 S.W.3d at 759-61; *see also* 1 McCormick § 185, at 1010.

*Id.* The evidentiary issues to be reviewed in the case under submission involve determining whether certain statements (1) were hearsay and (2) fit under an exception to the hearsay rule. These are questions of law subject to de novo review. *Id.*

### 1. Dr. Daniel Lee Testimony

The Defendant first contends that the trial court improperly admitted hearsay during the testimony of Dr. Daniel Lee. He notes that he filed a motion in limine, and the trial court ruled that Mrs. Melendez's statements to Dr. Lee were inadmissible hearsay because they were not for the purpose of a medical diagnosis or treatment. The morning of trial, the State posited that Dr. Lee had treated Mrs. Melendez for leg pain, so her statements to him regarding the allegations were admissible. The trial court held a hearing outside the presence of the jury after which it found:

> Again, the Court doesn't believe that that would fall under the hearsay exception for medical diagnosis and treatment because it was not related to the care that she received. However, with respect to his testifying about whether she told him about these events, yes, he can. But, there is a caveat to that; that, in the Court's mind, is, really, cumulative. And we have heard it from other witnesses, who have testified as to what she said. And, I think, he's limited to saying that she told him about her sexual assault, and it shouldn't really, go

23

further than that.

The Defendant renewed his objection. Dr. Lee testified before the jury that Mrs. Melendez had told him that the Defendant had sexually abused her. The Defendant contends that Dr. Lee's testimony was impermissible hearsay that did not fall within any exception. The State counters first that the statements are not hearsay because they were not offered to prove the truth of the matter asserted but, rather, were offered to provide an explanation and context for Dr. Lee's observation that Mrs. Melendez behaved as if she did not trust him and insisted on her friend remaining in the treatment room. The State further contends that, even if the trial court erred in admitting this testimony, the Defendant cannot prove he was prejudiced by the ruling.

We find unpersuasive the State's contention that this evidence was not hearsay. The State was attempting to convict the Defendant for rape and sexual battery. It offered proof that the victim had reported to another acupuncturist shortly after her appointment with the Defendant that the Defendant had sexually assaulted her. This statement was clearly offered to prove the truth of the matter asserted, i.e. that the Defendant sexually assaulted Mrs. Melendez. We also find no exception within which this hearsay evidence falls. Mrs. Melendez's statement that the Defendant sexually assaulted her was not made to Dr. Lee in order that he could treat her sciatic nerve pain in her back. Accordingly, the trial court erred when it admitted this evidence.

We must therefore turn to decide whether this non-constitutional error was harmless. This issue is analyzed using the framework provided by Tennessee Rule of Appellate Procedure 36(b). The Tennessee Supreme Court has stated:

> Where an error is not of a constitutional variety, Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); *State v. Ely*, 48 S.W.3d 710, 725 (Tenn. 2001); *State v. Harris*, 989 S.W.2d at 315. When the appellate courts are assessing the impact of a non-constitutional error, Tennessee Rule of Appellate Procedure 36(b) requires them to consider the whole record. Thus, the courts may appropriately consider the properly admitted evidence of the defendant's guilt. *State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn. 2000). The greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial. *State v. Toliver*, 117 S.W.3d 216, 231 (Tenn. 2003); *State v. Francis*, 669 S.W.2d 85, 91 (Tenn. 1984).

24

When an appellate court undertakes a harmless error analysis its purpose is to ascertain the actual basis for the jury's verdict. *State v. Mallard*, 40 S.W.3d 473, 489 (Tenn. 2001); *Momon v. State*, 18 S.W.3d at 168. An inquiry into harmless error does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. *See, e.g., State v. Toliver*, 117 S.W.3d at 231; *State v. Allen*, 69 S.W.3d at 191; *see also Kotteakos v. United States*, 328 U.S. at 764-65, 66 S.Ct. 1239. To the contrary, the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making. *See e.g., Kotteakos v. United States*, 328 U.S. at 764, 66 S.Ct. 1239; *State v. Denton*, 149 S.W.3d at 16-17; *State v. Dooley*, 29 S.W.3d 542, 555 (Tenn. Crim. App. 2000). Where an error more probably than not had a substantial and injurious impact on the jury's decision-making, it is not harmless. *Kotteakos v. United States*, 328 U.S. at 776, 66 S. Ct. 1239.

*State v. Rodriguez*, 254 S.W.3d 361, 371-72 (Tenn. 2008). Viewing the testimony, we conclude that the Defendant cannot prove that the trial court's admission of Mrs. Melendez's statement to Dr. Lee that the Defendant had sexually assaulted her and that he encouraged her go to the police more probably than not affected the outcome of the trial. *See* Tenn. R. App. P. 36 (b). Mrs. Melendez testified that she told Dr. Lee about the assault and that he encouraged her to report the incident. Dr. Lee's testimony in this regard, while admitted in error, did not rise to the level necessary to have, alone, affected the outcome of the trial.

### 2. Olga Alduenda

The Defendant next contends that the trial court erred when it allowed the State to elicit hearsay testimony from Mrs. Alduenda that it had previously ruled was inadmissible. At a motion hearing on the Defendant's motion in limine to exclude hearsay, the Defendant's attorney argued that statements by Mrs. Melendez to Mrs. Alduenda about the Defendant sexually assaulting her were inadmissible hearsay. The trial court apparently agreed, finding, "I just don't see that th[ese statements to Mrs. Alduenda] would fall under [any] exceptions to the hearsay rule."

During the trial, the Assistant District Attorney asked Mrs. Alduenda if Mrs. Melendez had "told [her] that she had already gone to an acupuncturist?" and asked her "when did she tell [you] that she had gone to an acupuncturist?" The following testimony was given:

> [MRS.] ALDUENDA: And the doctor left. That's when she started, like, crying. And I say, "What happened?" And she saying, "Something went

25

really wrong with the other doctor. Now, I find out, this is completely different." And I said, "What is different about it?" "Because the other doctor asked me to undress completely."

The Defendant objected to hearsay, and the trial court found, "I think she can say what she told her." The witness went on:

> [MRS.] ALDUENDA: And she started crying and telling me that the other doctor asked her to undress completely. And I said, "Did you undress?" She said, "Yes, I didn't know how was the treatment. It was first time I was going to acupuncture. I didn't know how these things, you know, work." So, and I said, "Okay." But she kept crying. I said, "And then he put needles in?" Said, "No, he give me a massage on my body."
>
> . . . .
>
> [MRS.] ALDUENDA: And I say, "Is there something you want to tell me, or you want to talk to me about it?" Because, you know, very personal. She was crying a lot. And once she said she was undressed, I was, like, "What happened then?" And she say, "Yeah, well, he touched my breasts. She – he had (unintelligible) my breasts, and give me a massage." And, you know, she keeps crying and crying. And I said, "Oh, that's – I mean, that's not good. It never happened to me." And . . . she say, "but also, he went down and massaged my vagina area." I said, "What did you do?" "I said nothing. I was just, you know, crying. I didn't know what to do."

The Defendant's attorney again objected on hearsay grounds, and the trial court stated, "If it's what Ms. Melendez told her she's allowed to testify to that. Other things, that's a different matter." Mrs. Alduenda then testified that Mrs. Melendez told her that the Defendant had put his finger in her anus and that it was like a "ripping inside feeling." At no point did the trial court instruct the jury as to how it should consider this evidence.

Later, the Defendant's attorney moved for a mistrial based upon the admission of this hearsay. The trial court stated that it had admitted these statements pursuant to the hearsay exception covering prior consistent statements.

As previously stated, "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally inadmissible except as provided by the rules of evidence or otherwise by law. *Id.* at 802. "Prior statements of witnesses,

whether consistent or inconsistent with their trial testimony, constitute hearsay evidence if offered for the truth of the matter asserted[.]" *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (citing *Mays v. State*, 495 S.W.2d 833 (Tenn. Crim. App. 1972); *Johnson v. State*, 596 S.W.2d 97 (Tenn. Crim. App. 1979)).

As a general rule, evidence of prior consistent statements is inadmissible to rehabilitate an impeached witness. *Id.* However, "prior consistent statements may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied." *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988); *see State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998). In order to be admissible, the witness's "testimony must have been assailed or attacked to the extent that the . . . testimony needs rehabilitating." *Hodge*, 989 S.W.2d at 725. The impeaching attack on the witness's credibility need not be successful in order to admit the prior consistent statement, and wide latitude is given when determining whether the witness's credibility has been sufficiently assailed or attacked. *State v. Albert R. Neese*, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387, at *6 (Tenn. Crim. App., at Nashville, Dec. 15, 2006), *perm. app. denied* (Tenn. Apr. 23, 2007). If admitted for the purpose of rehabilitating a witness, the statement is not hearsay because it is not admitted to prove the truth of the matter asserted. Neil P. Cohen et al., Tennessee Law of Evidence § 8.01[9] (6th ed. 2011). Prior statements of witnesses, however, may not be admitted as substantive evidence. *See Sutton v. State*, 155 Tenn. 200, 204, 291 S.W. 1069, 1071 (1926); *see State v. Carpenter*, 773 S.W.2d 1, 11 (Tenn. Crim. App. 1989); *see also Braggs*, 604 S.W.2d at 885. Additionally, a trial court must instruct the jury that the prior consistent statement cannot be used for the truth of the matters contained therein. *State v. Rogery Wayne Henry, Jr.*, No. M2013-02490-CCA-R3-CD, 2015 WL 226113, at *15 (Tenn. Crim. App., at Nashville, Jan. 16, 2015) (citing *State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993); *see Braggs*, 604 S.W.2d at 885) (holding that the trial court's failure to properly instruct the jury was harmless error), *no Tenn. R. App. P. 11 application filed*.

We conclude that, given the court's wide latitude, it did not abuse its discretion when it determined that Mrs. Melendez's statements to Ms. Alduenda were admissible for the purpose of rehabilitating Ms. Melendez's testimony. It would by far be a better practice, especially considering the trial court's ruling on the Defendant's motion in limine, for the trial court to hold a jury-out hearing and then inform the Defendant of its ruling and the basis for that ruling. The trial court, instead, said simply, "I think [Mrs. Alduenda] can say what [Mrs. Melendez] told her," providing no basis for the reversal of its prior ruling on the motion in limine. That being said, however, the Defendant did attack Mrs. Melendez by insinuating that she was fabricating this story in order for she and her husband to obtain a U-Visa and establish permanent residency in the United States. In light of this attack, the trial court did not err when it determined that Mrs. Melendez could be rehabilitated by testimony

of Mrs. Alduenda about the statements Mrs. Melendez made to her about the Defendant.

We further conclude that the trial court erred when it failed to instruct the jury as to how it should consider the evidence offered by Mrs. Alduenda. The State's case was a "he-said she-said" case consisting solely of Mrs. Melendez's testimony against the Defendant's testimony. The State was attempting to prove that the Defendant had sexually assaulted Mrs. Melendez. Mrs. Alduenda testified in detail about the statements that Mrs. Melendez made to her alleging that the Defendant had sexually assaulted her. The jury, with no instruction from the trial court as is required for the proper admission of prior consistent statements, may have considered the evidence as substantive evidence against the Defendant. Having reviewed the record as a whole, the evidence presented against the Defendant, and the testimony of the witnesses, we cannot conclude that the trial court's failure to instruct the jury about the proper consideration of this evidence was harmless. *See* Tenn. R. App. P. 36(b). Based on this error, as well as the cumulative error to be discussed, we reverse the Defendant's convictions and remand the case for a new trial on the charges of sexual battery.

### 3. Officer Laymance's Testimony

The Defendant contends that the trial court erred when it allowed Officer Laymance to testify about Mrs. Melendez's statements to her. The officer had no independent recollection of the statements, which were relayed to her via Mrs. Alduenda, who was interpreting for Mrs. Melendez. The Defendant takes issue with the fact that Mrs. Alduenda was not a certified translator and was under no duty to accurately translate the conversation. He asserts that this increased the risk that the hearsay statements contained in the officer's report were not reliable. The State counters that this testimony was proper, again citing the prior consistent statement exception to the hearsay rule.

As previously stated, the trial court is given wide latitude when deciding whether a witness's credibility has been attacked to the extent that rehabilitation with a prior consistent statement is warranted. *See Neese*, 2006 WL 3831387, at *6. Unfortunately, when the Defendant objected on grounds of hearsay, saying that the testimony was improper "corroboration" of Mrs. Melendez, the trial court stated simply, "Well, I'll allow this." It allowed the officer to read her report and then articulate to the jury the information contained in the report. The trial court offered the jury no instruction about how it should consider this evidence. We conclude that the trial court did not abuse its discretion when it admitted the evidence, but that it failed to properly instruct the jury concerning how it should consider the evidence. This error is a factor in our consideration of the Defendant's claim that the cumulative errors in this trial require the reversal of the Defendant's convictions.

### B. Victim's Bias

28

The Defendant next contends that the trial court improperly excluded defense evidence of the victim's bias and lack of credibility, thereby violating his right to confront his accuser. He points out that Mrs. Melendez's civil attorney referred Mrs. Melendez to a psychologist, Dr. Boero, to be evaluated to support her damages claim. On the morning of trial, Mrs. Melendez gave the State Dr. Boreo's report. The State gave the report to the trial court for an in camera inspection to determine whether it contained evidence favorable to the Defendant so as to require its disclosure to the Defendant. After review, the trial court ordered that the report be disclosed to the Defendant.

Dr. Boreo's report contains Mrs. Melendez's account of multiple instances of sexual and physical abuse performed against her by strangers. According to Mrs. Melendez, she was first abused at five years of age, and her last reported abuse was in young adulthood. The State filed a motion in limine to prevent the Defendant from asking Mrs. Melendez any questions pertaining to this past abuse. The Defendant argued that the questions would be relevant to explain the witness's description of Mrs. Melendez as being "broken" and "otherwise emotionally distraught."

The Defendant also points out that, during the trial, the trial court allowed the State to ask Mr. Jimenez about "counseling" that Mrs. Melendez was receiving, and the evidence implied that the counseling was related to the Defendant's actions toward her. The Defendant objected and moved to strike, and the trial court did strike the portion of Mr. Jimenez's testimony where he stated that he was aware that Mrs. Melendez was receiving counseling. The Defendant later asked the trial court to allow him to enter Dr. Boero's report to show that Mrs. Melendez had a history of sexual and physical abuse, which necessitated her counseling and that the counseling was not based solely on the Defendant's alleged actions. The trial court denied the Defendant's request.

The Defendant couches his argument in terms of his right to confront his accuser. A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000); *State v. Middlebrooks*, 840 S.W.2d 317, 332 (Tenn. 1992). Denial of a defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *see Coffee v. State*, 188 Tenn. 1, 216 S.W.2d 702, 703 (Tenn. 1948). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness

29

safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). This Court will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right. *Dishman*, 915 S.W.2d at 463; *see State v. Fowler*, 213 Tenn. 239, 373 S.W.2d 460, 466 (Tenn. 1963).

The State responds that Tennessee Rule of Evidence 412 specifically addresses the admission of evidence of a victim's "sexual behavior," which is defined as sexual activity of the alleged victim other than the sexual act at issue in this case. Tenn. R. Evid. 412(a). The Tennessee Rules of Evidence establish specific guidelines for admitting evidence of a victim's sexual behavior. Specifically, Rule 412 governs the admissibility of evidence about a sex crime victim's prior sexual acts. According to the Advisory Commission Comments to Rule 412, these guidelines have been established to maintain "a balance between the paramount interest of the accused in a fair trial and the important interests of the sexual assault victim in avoiding an unnecessary, degrading, and embarrassing invasion of sexual privacy."

Subsection (c) of Tennessee Rule of Evidence 412 states as follows:

Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:

> (1) Required by the Tennessee or United States Constitution, or

> (2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or

> (3) If the sexual behavior was with the accused, on the issue of consent, or

> (4) If the sexual behavior was with persons other than the accused,

>> (i) to rebut or explain scientific or medical evidence, or

30

(ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or

(iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe the victim consented.

Tenn. R. Evid. 412(c). Rule 412 is a rule of relevance, *see State v. Brown*, 29 S.W.3d 427, 430 (Tenn. 2000), and we will not overturn a trial court's Rule 412 ruling absent an abuse of discretion. *State v. Sheline*, 955 S.W.2d 42, 46 (Tenn. 1997).

Before evidence of a victim's sexual behavior may be admitted at trial, the accused must file a written motion ten days prior to trial, accompanied by an offer of proof describing the specific evidence and the purpose for introducing it. Tenn. R. Evid. 412(d)(1). After notice has been given, the trial court must conduct a jury-out hearing to determine whether the evidence is admissible. Tenn. R. Evid. 412(d)(2). "If the court determines that the evidence which the accused seeks to offer satisfies subdivisions (b) or (c)" of the rule, then the court must decide whether the probative value of the evidence outweighs the risk of unfair prejudice to the victim. Tenn. R. Evid. 412(d)(4). "[T]he evidence shall be admissible in the proceeding to the extent an order made by the court specifies the evidence which may be offered and areas with respect to which the alleged victim may be examined or cross-examined." *Id.*

As recognized by Rule 412(c)(1), there are instances where otherwise inadmissible evidence must be admitted in order to protect the constitutional rights of the accused. *See Chambers v. Mississippi*, 410 U.S. 284, 295-96 (1973); *State v. Brown*, 29 S.W.3d 427, 436 (Tenn. 2000). Our State Supreme Court has stated:

The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.

31

*Brown*, 29 S.W.3d at 433-34 (citing *Chambers*, 410 U.S. at 298-301). This Court must consider and balance the principles of relevance and hearsay under the Tennessee Rules of Evidence with the rights of the accused to confront and cross-examine witnesses and to call witnesses in his defense when determining whether the evidence is admissible.

We first conclude that some of the evidence contained in Dr. Boero's report is not governed by Rule 412. The report indicates that Mrs. Melendez had been verbally and physically abused by her father, had been attacked by a man who was beating a pregnant woman after Mrs. Melendez intervened, had herself attacked a man in a "rage" after he exposed himself and masturbated in front of her, had participated in counseling while in Guatemala, had suicidal thoughts stemming from when her father abused her mother, and left Guatemala based upon the corruption and violence in that country. None of this information or evidence falls within the purview of Rule 412. The trial court erred when it did not make a determination of whether this evidence was relevant evidence for the Defendant to use as a basis for cross-examination to show why Mrs. Melendez was "broken" and "otherwise emotionally distraught." Upon remand, and before the Defendant's new trial, the trial court should determine the admissibility of the evidence contained in the report that is not precluded pursuant to Tennessee Rule of Evidence 412.

We further conclude that the trial court did not err when it denied the Defendant's request to admit the evidence contained in the report that did fall within the purview of Rule 412. The State correctly notes that the trial court struck from the record Mr. Jimenez's testimony that Mrs. Melendez was in counseling. The trial court did not abuse its discretion when it did not allow the Defendant to recall Mrs. Melendez to ask her about the prior abuse based upon Mr. Jimenez's testimony that she had received "counseling."

### C. Cumulative Error

Finally, the Defendant contends that the cumulative effect of these errors warrants a new trial. We have already concluded that the Defendant is entitled to a new trial. We will discuss this issue, however, because we also conclude that the cumulative effect of the errors in this trial require reversal.

The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) (citations omitted). To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings. *State v. Odom*, 137 S.W.3d at 605 (appendix); *see State v. Guy*, 165 S.W.3d

651, 667 (Tenn. Crim. App. 2004); *State v. Mickens*, 123 S.W.3d 355, 397 (Tenn. Crim. App. 2003); *see also United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002).

The United States Court of Appeals for the First Circuit provided the following useful general insight into the nature of the considerations regarding the aggregation of errors that deprive a defendant of a fair trial:

Of necessity, claims under the cumulative error doctrine are sui generis. A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy–or lack of efficacy–of any remedial efforts); and the strength of the [State's] case. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial. *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993) (citation omitted); *see also United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005); *Alvarez v. Boyd*, 225 F.3d at 825.

*Hester*, 324 S.W.3d at 77.

This case was a case that essentially was decided based upon the testimony of Mrs. Melendez and the Defendant's testimony. The trial court allowed three witnesses to recount hearsay evidence of Mrs. Melendez relaying to them her account of the alleged sexual abuse and provided no instruction to the jury that it could not consider this evidence as substantive evidence. These errors were further compounded by the trial court's error in failing to rule on whether information contained in Dr. Boero's report that was not excluded pursuant to Tennessee Rule of Evidence 412 was relevant and admissible. We conclude that the cumulative effect of these errors entitles the Defendant a new trial. The trial court's judgments are, accordingly, reversed, and we remand for a new trial.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we reverse the trial court's judgment, and we remand for a new trial on the charges of sexual battery.

_____
ROBERT W. WEDEMEYER, JUDGE